UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TIMOTHY F. MAJORS,

      Plaintiff,

                                           Case No.:

v.

VISTA CLINICAL DIAGNOSTICS,
LLC and DAVIAN SAMUEL
SANTANA,

      Defendants.

_____/

## COMPLAINT

Plaintiff Timothy F. Majors ("Plaintiff" or "Majors") hereby sues Vista Clinical

Diagnostics, LLC ("Vista") and Davian Samuel Santana ("Santana") (Vista and Santana may be

referred to collectively hereinafter as "Defendants") and alleges as follows:

### Parties, Jurisdiction and Venue

1.      This is an action relating to an investment made by Majors in Vista. This action

includes causes of action for securities fraud under Section 10(b) of the Securities and Exchange

Act of 1934 ("Exchange Act"), 15 U.S.C. § 78 and 10b-5 thereunder, 17 C.F.R. §240.10b-5 and

Florida Statutes § 517.301, common law fraudulent inducement and misrepresentation, as well as

equitable accounting, declaratory relief, breach of contract, and breach of the duty of good faith

and fair dealing.

2.      Plaintiff is an individual citizen of Florida domiciled in Orange County, Florida.

3.      Vista is a limited liability company organized under Florida law with its principal

place of business in Lake County, Florida.

4.     Santana is an individual citizen of Florida domiciled in Lake County, Florida.  At all times material to the Complaint, Santana held himself out to Majors as the controlling member and president of Vista, a Florida limited liability company.

5.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. § 1331; and pursuant to supplemental jurisdiction under 28 U.S.C. §1367, because said claims "are so related . . . that they form part of the same case or controversy."

6.     The Court has personal jurisdiction over the parties named herein.

7.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391.

8.     Further, the Amended Operating Agreement (defined below) that is relevant to this action provides for the jurisdiction and venue of this Court.

9.     In connection with the acts and conduct alleged herein, defendant, directly and indirectly, used the means, facilities and instrumentalities of interstate commerce, including but not limited to: banks, wires, mail, e-mail, internet, interstate telephone communications, and interstate modes of travel (such as air travel).

10.     All conditions precedent to the filing of this action have been met, fulfilled or waived.

## Factual Background

## The Capital Investment

11.     Vista is an independent medical laboratory services provider originally founded by Santana and his former partner Nathan Hawkins ("Hawkins").

12.     Originally, Santana owned 55% of Vista and Hawkins owned the remaining 45% of Vista.

2

13. In February 2014, Santana, the president of Vista, approached and solicited Majors about making an investment in Vista. The parties met in Majors' office to discuss the investment opportunity for Majors and the need of Vista for additional working capital.

14. At that meeting in Majors' office, Santana told Majors the following:

a. that he wanted him to invest $1,500,000.00 (the "Investment Funds") in exchange for a 5% ownership interest in Vista;

b. that the Investment Funds would be used as working capital to help with the continued growth of the business;

c. that he had recently been offered $60,000,000.00 from a third party to purchase Vista;

d. that he turned down the $60,000,000.00 offer because he wanted to continue growing the business;

e. that $1,500,000.00 for 5% of Vista equated to a total valuation of $30,000,000.00, which was a 50% discount based on the recent offer;

f. that Hawkins was no longer a member or owner of Vista, that Santana was the sole member of Vista, and that his prior partnership with Hawkins was no longer an issue;

g. that Majors would be provided with financial information and disclosures before the closing and continuing as a minority owner;

h. that Majors would be given distributions consistent with a 5% ownership interest in the company; and

i. that if Majors was not satisfied with his investment for any reason, he would be able to demand and receive a refund of his investment.

3

15.     On February 6, 2014, Santana met with Majors' consultant, George Cannon ("Cannon"), at Vista's office in Clermont and made the following representations:

      a.     that he had been recently offered $60,000,000.00 from a third party to purchase Vista;

      b.     that he turned down the $60,000,000.00 offer because he wanted to continue growing the business; and

      c.     that Hawkins was no longer a member or owner of Vista, that Santana was the sole member of Vista, and that his prior partnership with Hawkins was no longer an issue.

16.     On February 7, 2014, Santana and Vista, via email from their counsel Ed Soulsby, provided to Majors a copy of the Original Operating Agreement with various amendments (the "Original Operating Agreement"). A copy of the Original Operating Agreement is attached hereto as **Composite Exhibit "A"**.

17.     The Original Operating Agreement included and disclosed to Majors certain Minutes of the Meeting of the Member of Vista Clinical Diagnostics, LLC dated April 27, 2011 (the "2011 Minutes"). A copy of the 2011 Minutes is included in Composite Exhibit A.

18.     Santana had control and authority over the terms, provisions, and representations made and included in the final versions of the Original Operating Agreement, including the 2011 Minutes, and signed each document personally.

19.     The 2011 Minutes state that in January 2010, Vista purchased from Hawkins his 45% of Vista in exchange for $283,500.00, payable in installments under a promissory note (the "Hawkins Note"). No other consideration for the purchase of Hawkins' ownership was disclosed in the 2011 Minutes, the Original Operating Agreement, or otherwise.

4

20. Vista and Santana provided other financials to Majors, none of which included references to any long-term liabilities to Hawkins except as provided in the Hawkins Note.

21. In February and early March 2014, the parties negotiated the terms of the investment.

22. During the negotiations, Santana repeatedly stated to Majors in person and in telephone conversations that he would be able to receive a full refund of the Investment Funds after two (2) years if he were unhappy with the investment for any reason.

23. Santana assured Majors that he would place a provision in the proposed operating agreement to this effect in order to protect Majors' $1,500,000.00 investment. Santana was unequivocal: If for any reason Majors was dissatisfied with his investment at the end of two years, Majors could resign and have his Investment Funds repaid.

24. On March 3, 2014, the parties met to close the transaction (the "Investment Date").

25. An Amended Operating Agreement dated March 3, 2014, was executed by Majors and Santana (the "Amended Operating Agreement"), and Majors delivered the Investment Funds to Vista. A copy of the Amended Operating Agreement is attached as **Exhibit "B"**.

26. In accordance with Santana's earlier promises, section 6.1 of the Amended Operating Agreement was drafted by Vista as follows:

> A Member may voluntarily resign his or her membership after having held his or her Ownership Interest for a period of two (2) years from the date of contributing capital to the Company. A resigning Member shall be entitled to receive from the Company either the book value of the resigning Member's Ownership Interest or the resigning Member's initial contribution to the Company, whichever is greater, as of the date of the Member's resignation. The Company shall purchase the resigning Member's Ownership Interest in four (4) equal annual installments, with the first installment being due sixty (60) days after the Member's resignation.

27.     Majors accepted this provision as the fulfillment of Santana's promise that Majors would be entitled to a return of his capital after two years. Prior to and at closing, Santana reiterated to Majors that he had § 6.1 of the Amended Operating Agreement drafted to memorialize his promise to Majors.

28.     Majors justifiably and reasonably relied on this promise and on the terms of § 6.1, and would not have invested the Investment Funds without this promise

29.     Also in accordance with Santana's representations, the Amended Operating Agreement listed Santana as a 95% owner in Vista with Majors owning the remaining 5%.

### Majors as Member

30.     By the fall of 2014, Vista and Santana essentially ceased providing information relating to Vista's finances and affairs to Majors, as required by the Amended Operating Agreement.

31.     Majors and his representatives made repeated demands on Vista for such information and were mostly ignored.

32.     Despite the provisions in the Amended Operating Agreement authorizing inspection of the books and records by members[1] and mandating periodic accountings to Members[2], Vista refused to provide such financial information to Majors relevant to his ownership interest.

33.     In fact, Majors has since learned that Santana deliberately instructed his staff to not provide financial statements to Majors or to discuss Vista's financial affairs with Majors or his representatives.

---

[1] Section 7.2
[2] Section 7.3

34.     In the spring of 2015, Majors made repeated inquiries to Santana and Vista as to the status of his 2014 K-1.

35.     Despite numerous requests, Majors did not receive a copy of the 2014 K-1 until March of 2016.

36.     In 2015 and while Majors was asking for his 2014 K-1, Vista provided a 2014 year-end balance sheet to Majors (the "Original 2014 Balance Sheet"). A copy of the Original 2014 Balance Sheet is attached as **Exhibit "C".**

37.     The only document provided by Vista between the fall of 2014 and March of 2016 pertinent to Major's ownership interest was the Original 2014 Balance Sheet.

38.     Majors has still not received a K-1 from Vista for tax year 2015.

39.     From March 3, 2014 until March 4, 2016, Majors did not receive a single distribution check from Vista on account of his 5% ownership interest.

40.     During this time, Vista made ownership distributions to Santana and Hawkins and Santana used Vista's operating account to improperly pay for personal and non-Vista related expenses.

41.     However, no information related to distributions was provided to Majors at the time the distributions were made.

### Majors' Resignation

42.     On March 4, 2016 (the "Resignation Date"), Majors resigned as a member of Vista by serving upon Santana and Vista a resignation letter (the "Resignation Letter"). A copy of the Resignation Letter is attached as **Exhibit "D".**

43.     Pursuant to section 6.1 of the Amended Operating Agreement, Majors demanded that the Investment Funds, or the book value of Majors' ownership interest, whichever is greater,

be returned to him in four annual installments with the first installment of $375,000.00 due on May 4, 2016.

## Vista's Failure to Provide Complete Financials

44.    Following his resignation, Majors demanded financial information from Vista relevant to unpaid distributions and to the book value of his interest in Vista.

45.    In late March 2016, Majors was provided limited financial information for Vista, including a revised year-end balance sheet for 2014 (the "Revised 2014 Balance Sheet") and a year-end balance sheet for 2015 (the "2015 Balance Sheet").

46.    The balance sheets revealed a handful of problematic financial issues for Vista, including:

      a.    payment of ownership distributions to Santana during 2014 and 2015;

      b.    substantial six and seven figure "deferred management fees"; and

      c.    a substantial and unexplained loss in retained earnings from 2014 to 2015.

47.    Additionally, the Revised 2014 Balance Sheet substantially changes and contradicts the information contained in the Original 2014 Balance Sheet. No explanation of the changes and contradictions is provided on the Revised 2014 Balance Sheet.

48.    The distribution payments, deferred management fees, and loss in retained earnings were not disclosed to Majors at the time they occurred.

## Majors Learns of the Secret Hawkins Buyout Arrangement

49.    Upon further inquiry following the recent financial disclosures, Majors discovered that the 2011 Minutes and the alleged buyback of Hawkins 45% ownership interest in 2010 was a fraud.

50.     In fact, Santana and Vista had actually, and secretly, entered into an arrangement where Hawkins would continue to own his 45% share of Vista but without disclosing that interest to third parties, including Majors.

51.     Pursuant to the fraudulent 2011 Minutes, the purchase of Hawkins' 45% took place in January of 2010.

52.     Near simultaneously, on March 2, 2010, Hawkins and his wife, Jessica Hawkins, entered into that certain Marital Settlement Agreement (the "Hawkins MSA").   A copy of the Hawkins MSA is attached hereto as **Exhibit "E"**.

53.     The Hawkins MSA was filed with the Circuit Court of Lake County, Florida, Case No. 2010-DR-000136.

54.     Pursuant to the § 27 of the Hawkins MSA, Hawkins' 45% share in Vista was valued by Hawkins at only $315,000.00.

55.     Pursuant to the 2011 Minutes and the Hawkins MSA, Santana and Hawkins purportedly agreed that the buyout would be structured as follows:

   a.      a $31,500.00 payment to Hawkins immediately; and

   b.      a $283,500.00 promissory note from Vista to Hawkins payable over 5 years at $5,000.00 per month (the "Hawkins Note").

56.     Pursuant to the Hawkins MSA, Hawkins' wife would receive half of the $31,500.00 lump sum payment and half of the $5,000.00 monthly payments under the Hawkins Note as they came due.

57.     The buyout price was structured in this way to induce Hawkins' then wife to accept a small equitable distribution in their pending divorce on account of Hawkins' interest in Vista.

58.     Santana knowingly and intentionally concealed the existence of Hawkins as a 45% owner of Vista from the time of Hawkins' divorce to present.

59.     In March of 2014, Majors became a 5% owner of Vista.

60.     Neither Santana nor Vista disclosed to Majors that Hawkins retained a 45% secret ownership interest in Vista.

61.     Neither Santana nor Vista disclosed to Majors that Vista was paying Hawkins membership distributions through 2014 based on his 45% ownership. The Revised 2014 Balance Sheet shows $345,000.00 in ownership distributions to Hawkins.

62.     Santana and Vista affirmatively represented to Majors that Hawkins was not an owner and that the Hawkins ownership interest had been fully and finally repurchased prior to Majors' investment.

63.     Unknown and undisclosed to Majors, between 2012 and 2014, Hawkins and Santana began having serious disputes regarding Vista and the proper management of the company.

64.     Unknown and undisclosed to Majors, Hawkins and Santana were locked in a major dispute and engendering serious personal animosity.

65.     After the Investment Date, Santana and Hawkins began or continued heated negotiations for a buyout of Hawkins' 45% ownership.

66.     Without disclosing the nature, purpose, or even existence of the negotiations to Majors, Santana and Vista reached an agreement whereby Hawkins would relinquish his 45% to Santana and in exchange Vista would pay Hawkins $5,040,000.00 payable over ten years in installments of $42,000.00 per month.

67.    Although Santana was the only person in position to benefit from the acquisition, Vista, and not Santana, agreed to and made the payments to Hawkins under the agreement to or for the benefit of Santana.

68.    Santana personally provided no consideration for his receipt of 45% of Vista from Hawkins.

69.    Following the Investment Date, Vista continued to make and conceal payments to Hawkins and neither Santana nor Vista disclosed to Majors that Vista was liable to Hawkins for millions of dollars for the personal benefit of Santana.

70.    These payments were improperly booked as membership distributions, "contractor" or "consulting" fees, and deferred management fees.

71.    Upon information and belief, the agreement was termed a "contractor" agreement ostensibly for Hawkins to provide "consulting services" as the pretext for the $42,000.00 monthly payments.  The reality was that Hawkins was no longer providing services for Vista.  This allegation is based upon representations made by Hawkins that his agreement with Vista and Santana is named a "consulting agreement" and based upon the fact that large "deferred management fees" were paid to Hawkins at a time when Hawkins was not providing any services to Vista and was effectively "locked out" of the company's operations due to his disputes with Santana.

72.    Majors was never notified that profits and working capital of Vista were being used to pay for Santana's personal acquisition of Hawkins' 45%.

73.     Upon information and belief, Vista used a portion of the Investment Funds to fund the acquisition of Hawkins' interest and not for working capital as represented. [3]

74.     Upon information and belief, Santana was using the profits of Vista and the Investment Funds to increase his personal ownership interest in Vista. [4]

75.     These payments to Hawkins by Vista were effectively distributions of profit to Santana.

76.     When Santana solicited Majors to purchase 5% of Vista, he knew Hawkins ownership, the value of Hawkins ownership, and the fact that he would have to repurchase Hawkins' ownership, and Santana, acting personally and as agent for Vista, intentionally and fraudulently chose to deceive Majors and not to disclose the arrangement to Majors or the existence and consequences of Santana and Hawkins' disputes.

77.     These payments to Hawkins by Vista also constitute waste and misappropriation of company assets, purposefully diverted from the company to the benefit of Santana and at the expense of Majors, the minority investor.

78.     Some of these payments to Hawkins were booked by Vista as "deferred management fees" when they were, in fact, the purchase price of Hawkins' 45% ownership. Vista and Santana therefore treated these payments as "expenses" rather than distributions, which, upon

---

[3] This allegation is based upon the timing of the two transactions and the fact that the financial statements later provided to Majors revealed that numerous, unexplained payments were made by Vista to Hawkins in the same year as the Investment Funds were received by Vista.

[4] This allegation is based upon the timing of the two transactions and the fact that the financial statements later provided to Majors revealed that payments were made to Hawkins by Vista to purchase Hawkins' 45% ownership for Santana in the same year that the Investment Funds were received by Vista.

information and belief, constitutes a tax fraud. Such actions have and may continue to damage Vista and have damaged the value of Majors' minority interest. [5]

79.     Moreover, the transfer of Hawkins' 45% of Vista to Santana is a fraudulent transfer to Santana made for no consideration and at a time when Vista was insolvent.

80.     Additionally, the transfer of Hawkins' 45% to Santana was not proportional to Majors, who as a 5% owner was entitled to at least a *pro rata* percentage of Hawkins' ownership.

81.     Vista and Santana's failure to disclose Hawkins' ownership and the existing dispute to Majors was material and intentionally deceptive.

82.     The 2011 Minutes and the Original Operating Agreement were also intentionally deceptive as Santana and Vista omitted any mention of Hawkins' continued ownership and the ongoing shareholder disputes. By disclosing only a fraudulent arrangement with Hawkins, Vista and Santana led Majors to believe that the Hawkins Note was the sole consideration for the repurchase by Santana of Hawkins' 45% and that Hawkins was no longer an owner of Vista.

83.     Additionally, the 2010, 2011, and 2012 Vista tax returns provided to Cannon by Santana at a meeting at Vista's office in Clermont on February 6, 2014 show Santana as a 98.27% owner[6] in Vista in 2010 and a 100% owner in Vista in 2011 and 2012. A copy of the 2010, 2011 and 2012 tax returns is attached as composite **Exhibit "F"**.

84.     Neither Vista nor Santana provided to Majors any minutes, corporate authorization documents, or other documents disclosing Hawkins' continued 45% ownership and continued receipt of membership distributions after January 2010 and prior to the Investment Date.

---

[5] The allegation regarding tax fraud is based upon the belief that the purchase of stock or ownership for the benefit of a remaining owner of the company is equivalent to a distribution to the remaining owner and not an expense or other deductible consulting fee.

[6] The other 1.73% owner was Hawkins. The percentages are in line with the fraudulent buyout which purportedly occurred early in January 2010.

85.     Had Majors known about the secret ownership of Hawkins, the disputes between Santana and Hawkins, the continued and eventual seven-figure liability of Vista to Hawkins, the false valuation presented to Hawkins' wife, or the tax implications related to the false "deferred management fees," he would not have made the investment in Vista.

### Majors Learns of the Santana Marital Settlement Agreement

86.     On March 14, 2014, only eleven (11) days after the Investment Date, Santana entered into a pre-divorce Marital Settlement Agreement with his then wife, Faith Santana (the "Santana MSA"). A copy of the Santana MSA is attached hereto as **Exhibit "G"**.

87.     The Santana MSA was filed with the Circuit Court in and for Lake County, Florida in Case No. 2014-DR-000679 on April 3, 2014.

88.     On page 20 of the Santana MSA, Santana made the following sworn representations to his wife:

    a.     that he was the sole owner of Vista;

    b.     that his ownership interest in Vista was marital property; and

    c.     that he made a complete financial disclosure concerning his assets, including his interest in Vista, to his then wife prior to execution of the MSA.

89.     In the Santana MSA, Santana and his then wife agreed that the value of her marital portion[7] of Santana's Vista interest was $960,000.00 and that Santana would pay this amount over 20 years with the first monthly payment being due on April 1, 2014.

90.     Santana was making sworn financial disclosures to his wife at the same exact time he was negotiating the Majors investment.

---

[7] Presumably 50% of Santana's 95%, or as represented to her, 100%, ownership of Vista

91.     While Santana was claiming to Majors to have received a $60,000,000.00 offer for Vista, he was at the same time submitting documents to his wife and the family law court showing a value of Vista under $2,000,000.00.

92.     While Santana was accepting payment from Majors of $1,500,000.00 for only 5% of Vista, he was at the same time making sworn representations to his wife that her equitable share of Vista was worth only $960,000.00.

93.     In addition, the Santana MSA provided that if Santana sold any portion of his ownership in Vista prior to full repayment of Santana's wife, then Santana would pay those proceeds over to his wife until his obligations to her were repaid in full.  Santana agreed to this provision only 11 days after selling 5% of Vista to Majors for $1,500,000.00.

94.     The sale of 5% to Majors was not disclosed in the Santana MSA and instead the Santana MSA states (falsely) that Santana was 100% owner, presumably because if Santana's wife heard he only owned 95% and she inquired as to the other 5%, she would have learned of the valuation being presented to Majors, and the very recent proceeds from the Investment Funds, and demanded more.

95.     Concurrently, Santana did not disclose to Majors the ongoing representations to his wife or that he was representing the value of Vista at less than $2,000,000.00 to a court of law.

96.     In fact, Santana repeatedly represented to Majors that Vista was worth more than $60,000,000.00 and that Majors was receiving a 50% discount from market value.

97.     Santana knowingly and intentionally misrepresented the value of Vista to induce Majors into investing in Vista.

98.     Had Majors been aware of the valuation Santana provided to his then wife and to the Lake County Circuit Court, he would not have made an investment in Vista.

15

### May 2016 Amendment

99.     After receipt of the Resignation Letter, on May 3, 2016, Santana purportedly amended section 6.1 of the Amended Operating Agreement to state (the "May Amendment"):

"**6.1 Resignation of Membership and Return of Capital**

A.  A Member may voluntarily resign his or her membership after having held his or her Ownership Interest for a period of two (2) years from the date of contributing capital to the Company. A resigning Member shall be entitled to receive a distribution from the Company in an amount equal to either the book value of the resigning Member's Ownership Interest or the resigning Member's initial contribution to the Company, whichever is greater, as of the date of the Member's resignation. Upon resignation, the resigning member shall become a dissociated member and thereby a transferee in accordance with §605.0609(3) of the Florida Revised Limited Liability Company Act ("FRLLCA").

B.  On March 4, 2016, Timothy Majors (the "Dissociated Member"), who previously held a Nonvoting Interest in the Company, voluntarily dissociated and became a transferee. Since the Dissociated Member's contribution to the Company in the amount of $1.5 million is greater than the book value of the Dissociated Member's transferable interest, the amount due to the Dissociated Member is $1.5 million. The Company shall purchase such transferable interest held by the Dissociated Member on the following terms:

1)  On July 31, 2016, the Company shall pay to the Dissociated Member the sum of One Hundred Thousand and No/100 Dollars ($100,000.00);

2)  On July 31, 2017, the Company shall pay to the Dissociated Member the sum of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00);

3)  On July 31, 2018, the Company shall pay to the Dissociated Member the sum of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00);

4)  On July 31, 2019, the Company shall pay to the Dissociated Member the sum of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00);

5)  On July 31, 2020, the Company shall pay to the Dissociated Member the sum of Six Hundred Fifty Thousand and No/100 Dollars ($650,000.00)."

The May Amendment is attached as **Exhibit "H"**.

100. The May Amendment was enacted in an attempt to deprive Majors of his vested contract right to receive a return of his Investment Funds over four (4) years in equal installments starting on May 4, 2016.

101. The May Amendment is a naked attempt to deprive Majors of his rights and is void as a matter of law as it purports to remove a vested, contractual right.

102. Santana and Vista have essentially repudiated their contractual obligations in the Amended Operating Agreement stating that they are instead permitted to amend Majors' rights *ad infinitum* and effectively out of existence.

103. The May Amendment is oppressive and expropriative.

104. The May Amendment was enacted in bad faith by Vista and Santana as means to deprive Majors of the benefit of his bargain.

105. The May Amendment is the final culmination of Vista and Santana's fraudulent scheme. Vista and Santana induced Majors to invest with deceptions, misrepresentations, and material omissions, and with the express promise that after two years, Majors could unconditionally receive a return of his investment. Then, after accepting and using the Investment Funds, Vista and Santana now purport to remove even that right and safeguard from Majors, who is according to them now left with nothing in return.

106. Had Majors known that Santana and Vista never intended to comply with their promise to return Major's capital on an agreed schedule after two years, Majors would never have invested in Vista.

### The Partial Payment by Vista

107.    On or about July 29, 2016, Vista delivered to Majors a check in the amount of $150,000.00 as a partial repayment of the Investment Funds (the "Partial Payment").

108.    The Partial Payment is less than the amount owed as May 4, 2016, which was at a minimum $375,000.00.

109.    Majors accepted the Partial Payment expressly without waiving his rights to full and timely repayment of the remaining Investments Funds.

### Majors Learns of the Usurpation of Corporate Opportunities

110.    After Santana and Vista executed the purported May Amendment to the Amended Operating Agreement, Majors further investigated the operations of Vista.

111.    Majors learned of the existence of additional, significant creditors.

112.    Upon information and belief, to avoid these creditors, Santana was redirecting business, receivables, and Medicaid and Medicare payment to another entity owned by Santana, Advanced Clinical Laboratories, Inc. ("ACL").[8]

113.    Upon information and belief, Santana has been and continues to funnel Vista's business to ACL in an attempt to avoid creditors, including Majors.[9]

114.    Upon information and belief, these activities constitute a breach of Santana's duty of loyalty to Vista, a breach of his fiduciary duties to Majors as his minority shareholder, and a usurpation of corporate opportunities.[10]

---

[8] These allegations are based on representations made to Majors to this effect by a former employee of Vista.

[9] These allegations are based on representations made to Majors to this effect by a former employee of Vista.

[10] These allegations are based on representations made to Majors to this effect by a former employee of Vista.

115.    In the meantime, without discovery and an accounting, Majors will have no adequate remedy at law.

116.    All conditions precedent to the bringing of this action have occurred, have been waived, or have otherwise been satisfied.

### First Cause of Action
(Violation of Section 10(b) and Rule 10(b)(5) of the Securities
and Exchange Act of 1934 against Vista and Santana)

117.    Plaintiff restates and realleges the allegations contained in paragraphs 1 – 116 herein.

118.    Defendants, by use of means or instrumentality of interstate commerce or of the mails, sold securities representing an equity interest in Vista.

119.    Santana, individually and in his capacity as officer of Vista, knowingly and intentionally made or adopted the material false statements described herein to Majors prior to the Investment Date, including the following (collectively the "Fraudulent Misrepresentations"):

    a.    that he had been offered $60,000,000.00 from a third party to purchase Vista[11];

    b.    that a $1,500,000.00 investment would equate to a 50% discount on the value of Vista[12];

    c.    that the Investment Funds would be used as working capital in Vista and that he needed Majors help providing working capital to help the business maintain and grow[13];

---

[11] While Majors does not remember the exact dates, this misrepresentation was made multiple times by Santana to Majors in February of 2014 in person at Majors' office and over phone conversations. Additionally, this misrepresentation was made to Cannon by Santana in a meeting at Vista's Clermont office on February 6, 2014.

[12] While Majors does not remember the exact dates, this misrepresentation was made multiple times by Santana to Majors in February of 2014 in person at Majors' office and over phone conversations.

[13] While Majors does not remember the exact dates, this misrepresentation was made multiple times by Santana to Majors in February of 2014 in person at Majors' office and over phone conversations.

    d.   that Santana was the sole member and owner of Vista[14];

    e.   that Hawkins was no longer a member in Vista[15];

    f.   that all issues associated with Hawkins' buyout had been resolved in January 2010[16]; and

    g.   that Vista would refund the Investment Funds to Majors if he was dissatisfied with his investment for any reason at the end of the two year period[17].

---

[14] These misrepresentations were made (i) in the Original Operating Agreement and 2011 Minutes provided to Majors on February 7, 2014, by attachment in an email from counsel for Vista and Santana, Ed Soulsby, Esq., to counsel for Majors, Roman Hammes, Esq., sent at the direction of Santana, personally and as agent for Vista, (ii) in the various drafts of the Amended Operating Agreement provided to Majors on February 20, 2014, February 25, 2014, and March 2, 2014, by attachment in emails from counsel for Vista and Santana, Ed Soulsby, Esq., to counsel for Majors, Roman Hammes, Esq., sent at the direction of Santana, personally and as agent for Vista, (iii) in the final draft of the Amended Operating Agreement provided to Majors personally by Ed Soulsby, Esq., at the present direct instruction of Santana during the closing of the transaction on March 3, 2014, which took place at Majors' office in Orlando, (iv) in the 2010, 2011 and 2012 tax returns provided by Santana to Cannon at a meeting in Vista's Clermont office on February 6, 2014 and in conversations during that meeting and (v) while Majors does not remember the exact dates, this misrepresentation was made multiple times by Santana to Majors in February of 2014 in person at Majors' office and over phone conversations.

[15] These misrepresentations were made (i) in the Original Operating Agreement and 2011 Minutes provided to Majors on February 7, 2014, by attachment in an email from counsel for Vista and Santana, Ed Soulsby, Esq., to counsel for Majors, Roman Hammes, Esq., sent at the direction of Santana, personally and as agent for Vista, (ii) in the various drafts of the Amended Operating Agreement provided to Majors on February 20, 2014, February 25, 2014, and March 2, 2014, by attachment in emails from counsel for Vista and Santana, Ed Soulsby, Esq., to counsel for Majors, Roman Hammes, Esq., sent at the direction of Santana, personally and as agent for Vista, (iii) in the final draft of the Amended Operating Agreement provided to Majors personally by Ed Soulsby, Esq., at the present direct instruction of Santana during the closing of the transaction on March 3, 2014, which took place at Majors' office in Orlando, (iv) in the 2010, 2011 and 2012 tax returns provided by Santana to Cannon at a meeting in Vista's Clermont office on February 6, 2014 and in conversations during that meeting and (v) while Majors does not remember the exact dates, this misrepresentation was made multiple times by Santana to Majors in February of 2014 in person at Majors' office and over phone conversations.

[16] These misrepresentations were made (i) in the Original Operating Agreement and 2011 Minutes provided to Majors on February 7, 2014, by attachment in an email from counsel for Vista and Santana, Ed Soulsby, Esq., to counsel for Majors, Roman Hammes, Esq., sent at the direction of Santana, personally and as agent for Vista, (ii) while Majors does not remember the exact dates, this misrepresentation was made multiple times by Santana to Majors in February of 2014 in person at Majors' office and over phone conversations and (iii) by Santana in his meeting with Cannon at Vista's Clermont office on February 6, 2014.

[17] This misrepresentation was made (i) on a telephone call between Majors and Santana, personally and as agent for Vista, on February 28, 2014, (ii) in the various drafts of the Amended Operating Agreement provided to Majors on February 20, 2014, February 25, 2014, and March 2, 2014, by attachment in emails from counsel for Vista and Santana, Ed Soulsby, Esq., to counsel for Majors, Roman Hammes, Esq., sent at the direction of Santana, personally and as agent for Vista, and (iii) in the final draft of the Amended

120. Santana, individually and in his capacity as officer of Vista, and while having a duty and responsibility to disclose, knowingly and intentionally concealed the material information described herein from Majors prior to the Investment Date, including the following (the "Fraudulent Omissions"):

a. the 2010 scheme to defraud Hawkins' ex-wife as reflected in the Hawkins MSA;

b. the falsity of the 2011 Minutes, the Original Operating Agreement, and included corporate documents;

c. The falsity of the financial statements provided to Majors, including the statements in said documents fraudulently describing Hawkins as no longer an owner of Vista;

d. Hawkins' continued 45% ownership interest in Vista;

e. the ongoing dispute between Vista, Hawkins, and Santana;

f. the acrimonious relationship between Hawkins and Santana;

g. the imminent seven figure buyout of Hawkins' secret, continued 45% ownership interest;

h. the ongoing negotiations with Santana's then wife concerning the value of Vista and the representations made by Santana to his wife regarding the value of Vista as evidenced in the Santana MSA;

i. Santana's valuation of Vista at less than $2,000,000.00 in his simultaneous divorce proceeding as evidenced in the Santana MSA;

---

Operating Agreement provided to Majors personally by Ed Soulsby, Esq., at the present direct instruction of Santana during the closing of the transaction on March 3, 2014, which took place at Majors' office in Orlando.

     j.     Vista making, and intending to continue making, ownership distributions to Hawkins in exchange for his 45% ownership interest; and

     k.     Vista's mischaracterization of ownership distributions as management and consulting fees on financial statements and tax returns filed with the Internal Revenue Service, including the tax return for Vista for 2014.

121.     Santana was the primary and direct violator and made, or caused to be made, the Fraudulent Misrepresentations to Majors and the Fraudulent Omissions.

122.     Santana was an agent for Vista and committed these violations, which are attributable to Vista.

123.     Defendants, directly or indirectly, by the use of means of instrumentalities of interstate commerce and/or the United States mail, engaged in and participated in a continuous plan, scheme, or course of conduct to deceive Majors as alleged herein, with respect to and in connection with Majors' purchase of securities.

124.     Defendants knew or, but for their deliberate recklessness, should have known that the Fraudulent Misrepresentations and Fraudulent Omissions described herein and contained in the financials and corporate documents provided to Majors were materially false, but made the statements to Majors anyways.

125.     Defendants made these misrepresentations and omissions with the intent to deceive or defraud Majors with respect to Defendants' true objectives in order to induce Majors to pay the Investment Funds and invest into Vista

126.     Santana, personally and as agent for Vista, knew that if he told Majors there was an offer for Vista for $60,000,000.00 he could induce Majors to invest by giving him a "discount" of 50% of the company's value.

127.    Santana also knew and that by offering Majors a "deal" on the ownership interest combined with a representation that the investment would be used to increase needed working capital to grow the business, he could induce Majors to make the investment.

128.    In fact, Santana knew the company was not worth $60,000,000.00 and knew that he would use the Investment Funds for uses other than as working capital.

129.    Santana, personally and as agent for Vista, knew that if he told Majors (i) that Hawkins was still a secret 45% owner of Vista, (ii) that Hawkins and Santana were involved in a serious and heated dispute about Hawkins' ownership of Vista, (iii) that Hawkins was seeking significant compensation for his 45% ownership of Vista, (iv) that Hawkins was receiving ownership distributions from Vista and would continue to receive such distributions from the profits of Vista that would otherwise be available for operations or distributions to Majors, (v) that Santana had fraudulently arranged Hawkins' ownership to be secret so as to defraud third parties, (vi) that Santana was fraudulently booking certain of the distributions to Hawkins as "deferred management fees" and other false expenses thus complicating Vista's tax returns, and (vii) that Santana signed and adopted the 2011 Minutes which were fraudulent, then Majors would never invest as Majors would never have given Vista $1,500,000.00 for ownership in a company with the above issues.

130.    Santana, personally and as agent for Vista, knew that if he told Majors he could get an absolute return of his Investment Funds after a period of two years, that Majors would feel safe and comfortable in his investment with Vista.

131.    Santana, personally and as agent for Vista, knew that if Majors did not have this right Majors would not invest as Majors had requested this right as a condition of his making the investment.

23

132. Santana knew that once Vista had received the Investment Funds, he could amend the Amended Operating Agreement to adjust Majors' repayment schedule to make it virtually irrelevant.

133. Santana, personally and as agent for Vista, knew that if he told Majors about the valuations and representations he was simultaneously making to his wife and to the Lake County Circuit Court in his divorce, specifically that Vista was worth approximately $2,000,000.00, and that Santana had sworn to this representation in the Santana MSA, then Majors would never have invested at the $1,500,000.00 price and/or would have demanded 75% of the ownership of Vista as commensurate with the valuation of Vista sworn to by Santana at the same time as his negotiations with Majors.

134. Because Santana wanted the Investment Funds and he knew he could not get them from Majors if Majors knew about the Fraudulent Misrepresentations and Fraudulent Omissions, Santana made the Fraudulent Misrepresentations and failed to disclose the Fraudulent Omissions.

135. The Fraudulent Misrepresentations and Fraudulent Omissions were not made by accident or on account of innocent oversight by Santana as Santana actively stated to Majors that Vista was worth $60,000,000.00 while simultaneously actively swearing to the Lake County Circuit Court that Vista was worth only $2,000,000.00 and by actively stating that Majors that all issues with Hawkins had been resolved while simultaneously in heated and serious disputes and negotiations with Hawkins about Hawkins continued, concealed 45% ownership of Vista.

136. Majors reasonably and justifiably relied upon Defendants' Fraudulent Misrepresentations in light of Santana's position within Vista and Santana's prior relationship with Majors.

137. The Fraudulent Misrepresentations and Fraudulent Omissions described herein and contained in the financials and corporate documents provided to Majors were made in connection with the purchase and sale of securities, as the deceptive practices alleged herein persuaded Majors to invest in Vista in ignorance of Defendants' schemes and without disclosure of material facts, terms, and risks of the investment or informed consent.

138. Rather than benefiting Vista, Santana served his own personal interest over and above those of Vista and Majors, in contravention of section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

139. Santana had actual knowledge or the Fraudulent Misrepresentations and/or Fraudulent Omissions of material fact made to Majors or acted with deliberate and reckless disregard for the truth in that he failed to ascertain and to disclose the true facts, even though such facts were available to him.

140. The Fraudulent Misrepresentations and Fraudulent Omissions described herein and contained in the financials and corporate documents provided to Majors were intentional or reckless and were uttered for the purpose of enriching himself at Majors' expense.

141. As a result of these fraudulent, deceptive, and misleading practices, Majors invested the Investment Funds, which immediately came under the dominion and control of Vista, and Santana as president of Vista.

142. Had Majors known of the materially false information or been told the truthful facts, he would not have made the investment and invested the Investment Funds.

143. Moreover, through his position of control of Vista, Santana was able to and did control the content of the Fraudulent Misrepresentations and Fraudulent Omissions disseminated to Majors as described herein and contained in the financials and corporate documents.

144.    In addition to the false statements and material omissions, and in furtherance of this unlawful scheme, plan, and course of conduct, Santana, personally and as agent for Vista, took the actions set forth above.  While in possession of material information, Santana (a) employed devise, schemes, and artifices to defraud; (b) made untrue statements of material fact and /or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the purchaser of securities, in violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5.

145.    Defendants violated Section 10(b) of the Securities and Exchange Act and Rule 10b-5.

146.    Defendants' material misrepresentations and omissions proximately caused Majors to suffer monetary damages through the loss of Majors' Investment Funds, the failure to receive distributions owed to Majors, and the devaluation of Majors' interest.

Wherefore, Plaintiff requests this Court to enter Judgment against Vista and Santana for actual damages in an amount not less than $1,350,000.00 plus punitive damages, and to enter such other relief as the Court deems appropriate.

### Second Cause of Action
(Violation of Florida Statutes § 517.301
Against Vista and Santana)

147.    Plaintiff restates and realleges the allegations contained in paragraphs 1 – 116, 118-144 and 146 herein.

148.    Defendants violated Florida Statutes § 517.301, which provides that, generally, it is unlawful, and a violation of the provisions of the Florida Securities and Investor Protection Act, for a person in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted from

registration and including any security sold in an exempted transaction, directly or indirectly to: (1) employ a device, scheme, or artifice to defraud; (2) obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

149.   Santana, personally and as an agent for Vista, participated in making the sale of the equity of Vista to Majors.

150.   Santana, personally and as an agent for Vista, knew or, but for their deliberate recklessness, should have known that the Fraudulent Statements and Fraudulent Omissions described herein and contained in the financials and corporate documents provided to Majors were materially false, but made the statements to Majors anyways.   Defendants made these misrepresentations and omissions with the intent to deceive or defraud Majors with respect to Defendants' true objectives.

151.   Additionally, the securities at issue in this matter were never registered.

152.   Upon information and belief, Defendants did not qualify for any exemption from registration.[18]

153.   No prospectus or private placement memorandum was provided to Majors.

154.   Pursuant to § 517.211(4), *Florida Statutes*, Majors is entitled to a return of the $1,500,000.00 initial investment plus interest, less amounts actually received in connection with the investment in Vista.

---

[18] This allegation is based on the fact that neither Santana nor Vista inquired as to whether Majors was an accredited investor, and that it is clear from the SEC EDGAR records that no Form D was ever filed by Vista memorializing an exemption as required under federal law.

155.    Additionally, pursuant to § 517.211(6), *Florida Statutes*, Majors is entitled to his reasonable attorney's fees and costs.

Wherefore, Plaintiff requests this Court to enter Judgment against Vista and Santana for rescission, damages, prejudgment and post-judgment interest, attorney's fees, court costs, and to enter such other relief as the Court deems appropriate.

### Third Cause of Action
(Fraudulent Inducement/Misrepresentation Against Vista and Santana)

156.    Plaintiff restates and realleges the allegations contained in paragraphs 1 – 116, 118 – 144 and 146 herein.

157.    Santana, individually and in his capacity as officer and agent of Vista, knowingly and intentionally made the Fraudulent Misrepresentations to Majors.

158.    Each of the Fraudulent Misrepresentations were made by Santana to induce Majors into investing the Investment Funds.

159.    Majors relied on the Fraudulent Misrepresentations in investing the Investment Funds into Vista.

160.    As a direct result of the Fraudulent Misrepresentations, Majors has been damaged and is entitled to an award of damages against Santana and Vista for fraudulent inducement and misrepresentation.

Wherefore, Plaintiff requests this Court to enter Judgment against Vista and Santana for fraudulent inducement and misrepresentation and to award actual damages in an amount not less than $1,350,000.00, plus punitive damages, and to enter such other relief as the Court deems appropriate.

**Fourth Cause of Action**
(Fraudulent Concealment against Vista and Santana)

161.    Plaintiff restates and realleges the allegations contained in paragraphs 1 – 116, 118-144 and 146 herein.

162.    Santana, individually and in his capacity as officer and agent of Vista, knowingly and intentionally made the Fraudulent Omissions.

163.    At all times leading up to Majors investment in Vista, Santana and Vista were aware that these material facts were not being disclosed to Majors.

164.    Santana and Vista intentionally omitted this information to induce Majors into investing the Investment Funds.

165.    Majors justifiably relied on the Fraudulent Omissions and as a direct result has been damaged.

Wherefore, Plaintiff requests this Court to enter Judgment against Vista and Santana for fraudulent concealment and to award damages in an amount not less than $1,350,000.00 plus punitive damages and to enter such other relief as the Court deems appropriate.

**Fifth Cause of Action**
(Equitable Accounting against Vista)

166.    Plaintiff restates and realleges the allegations contained in paragraphs 1 – 116 herein.

167.    From the Investment Date until his resignation, Majors was a 5% member in Vista.

168.    The Amended Operating Agreement required Vista to provide accountings to Majors.

169.    The Revised 2014 Balance Sheet and the 2015 Balance Sheet provided by Vista in March 2016 do not adequately illustrate the financial affairs of Vista from the Investment Date to the Resignation Date.

170.    The balance sheets, *inter alia*, do not itemize the distributions taken by Santana or provide enough information to explain the deferred management fees and the substantial loss in retained earnings or the payments to Hawkins.

171.    Additionally, the Revised 2014 Balance Sheet substantially changes and contradicts information contained on the Original 2014 Balance Sheet.

172.    The Original 2014 Balance Sheet shows $345,000.00 in ownership distributions to Hawkins.

173.    The Revised 2014 Balance Sheet omits this information.

174.    The Original and Revised 2014 Balance Sheet are additional frauds in a series of frauds perpetrated by Vista and Santana against Majors.

175.    Vista has extensive and complicated accounts and a full and complete accounting is warranted under the circumstances.

176.    An accounting is necessary to allow Majors to determine his right to further compensation from Vista on account of his 5% ownership interest. Pursuant to Majors' rights under the Amended Operating Agreement, he has a vested right to either the return of his Investment Funds, or 5% of the book value of Vista, whichever is greater.

177.    Majors is also entitled to an accounting to determine if Majors is entitled to a proportion of Hawkins' 45% ownership.

178.    Majors is further entitled to an accounting to determine the amount of corporate assets wasted and misappropriated by Santana, to calculate the distributions only made to Santana

and not to Majors, and to determine the amount company funds used by Santana to purchase Hawkins' 45% ownership for himself.

179.    Majors is also entitled to an accounting to explore the fraudulent relationship between Vista and ACL.

180.    Majors is also entitled to an accounting to the extent Vista is refusing to repay the Investment Funds based on § 605.0405(1), *Florida Statutes*.

181.    Majors does not have a remedy at law that will be as full, adequate and expeditious as an equitable accounting as no remedy at law will determine the book value of Majors' 5% ownership interest, no other remedy will determine what Majors' ownership interest should be, no other remedy will be sufficient to determine the amount of distributions which should have been made to Majors, no other remedy will be sufficient to determine the amount of waste and misappropriation by Santana, and the usurpation of Vista's assets and opportunities for the benefit of ACL, and no other remedy at law will be sufficient to determine whether Vista has the financial ability to repay Majors.

Wherefore, Plaintiff requests this Court to enter Judgment against Vista and compel them to provide a complete accounting of its financial affairs from the Investment Date until the Resignation Date and to provide such further accounting as is necessary to validate Vista's purported claim that it cannot repay the Investment Funds based on § 605.0405(1), *Florida Statutes*.

### Sixth Cause of Action
(Declaratory Relief against Vista and Santana)

182.    Plaintiff restates and realleges the allegations contained in paragraphs 1 – 116, 118-144 and 146 herein.

183.    This is an action brought pursuant to 28 U.S.C.A. § 2201 for declaratory relief.

184.   An actual, present, and justiciable controversy has arisen between the parties concerning the validity and enforceability of the May Amendment, and Santana and Vista have refused to make distributions to Majors based on their assertion of the validity of the May Amendment.

185.   Majors alleges that the May Amendment is invalid and ineffective to negate his vested contractual right to repayment as provided in section 6.1 of the Amended Operating Agreement and pursuant to his delivery of the Resignation Letter.

186.   Accordingly, Vista is obligated to repay the Investment Funds or the book value of Majors' interest, whichever is greater, over 4 years with the first payment having been due on May 4, 2016.

187.   Vista and Santana allege that the May Amendment is effective and permissible to retroactively modify section 6.1 to change the repayment schedule.

188.   Vista and Santana base this on § 605.0107(2)(a), *Florida Statutes*, which says:

> (2)    The obligations of a limited liability company...to a person in the person's capacity as a transferee or a person disassociated as a member are governed by the operating agreement. An amendment to the operating agreement made after a person becomes a transferee or is disassociated as a member:
>
> > (a) is effective with regard to a debt, obligation or other liability of the limited liability company...to the person in the person's capacity as a transferee or person disassociated as a member...

189.   Vista and Santana assert that pursuant to this statute, Vista and Santana were legally permitted to alter the Amended Operating Agreement to remove Majors' right to receive repayments.

190.   Vista and Santana assert this position although Majors' rights are undeniably vested, although Santana and Vista fraudulently misrepresented the enforceability of this

provision, although Santana and Vista are using this provision as a pretext to complete their fraud, and although Santana and Vista's argument would render the provision of the Amended Operating Agreement meaningless.

191.    Accordingly, Majors asks the Court to determine the legal rights of the parties under the Amended Operating Agreement and legal effect the May Amendment. Specifically, Majors asks the Court to determine the following:

        a.    whether § 605.0107(2)(a), *Florida Statutes*, allows Santana and Vista to amend the operating agreement to retroactively alter Majors' right to a refund of the Investment Funds or the schedule of same; and

        b.    whether under the circumstances of this case, the May Amendment should be deemed invalid and legally ineffective in light of the fraudulent conduct by Vista and Santana.

Wherefore, Plaintiff requests this Court to enter a Declaratory Judgment to determine the issues set forth above.

### Seventh Cause of Action
(Breach of Contract against Vista)

192.    Plaintiff restates and realleges the allegations contained in paragraphs 1 – 116 herein.

193.    The Amended Operating Agreement is a binding contract between Majors, Santana, and Vista.

194.    Majors has fully performed under the terms of the Amended Operating Agreement by paying the Investment Funds in full and by resigning from Vista in accordance with section 6.1 of same.

33

195.    Majors has complied with all conditions precedent to bringing this action.

196.    Pursuant to section 6.1 of the Amended Operating Agreement, Vista was obligated to pay Majors, at a minimum, the sum of $375,000.00 on or before May 4, 2016.

197.    Vista failed to pay this amount and has breached the Amended Operating Agreement.

198.    By virtue of the May Amendment, Vista has anticipatorily breached its continuing obligations to make further installment payments timely pursuant to section 6.1 of the Amended Operating Agreement.

199.    As a direct result, Majors has been damaged and is entitled to an award of damages against Vista for breach of contract.

Wherefore, Plaintiff requests this Court to enter Judgment against Vista for breach of contract and to award actual damages in an amount not less than $1,350,000.00, and to enter such other relief as the Court deems appropriate.

### Eighth Cause of Action
(Breach of Duty of Good Faith and Fair Dealing
against Vista)

200.    Plaintiff restates and realleges the allegations contained in paragraphs 1 – 116 herein.

201.    The Amended Operating Agreement is a binding contract between Majors, Santana and Vista.

202.    Majors has fully performed under the terms of the Amended Operating Agreement by paying the Investment Funds in full and by resigning from Vista in accordance with section 6.1 of same.

203.    Majors has complied with all conditions precedent to bringing this action.

204.   Vista has breached the contract by failing to repay Majors the first installment of the repayment of his Investment Funds due on May 4, 2016, and further anticipatorily breached its continuing obligations to make further installment payments timely pursuant to section 6.1 of the Amended Operating Agreement.

205.   The May Amendment is a breach of contract and a specific breach which unfairly interferes with Majors' receipt of the benefits of section 6.1 of the Amended Operating Agreement.

206.   The May Amendment, and the breaches of contract effected by it, do not comport with Majors' reasonable expectations under section 6.1 of the Amended Operating Agreement.

207.   As a direct result, Majors has been injured and is entitled to an award of damages against Vista for breach of the duty of good faith and fair dealing.

Wherefore, Plaintiff requests this Court to enter Judgment against Vista for breach of the duty of good faith and fair dealing and to enter an award of actual damages such other relief as the Court deems appropriate.

### Ninth Cause of Action
(Actual Fraudulent Transfers
against Santana)

208.   Plaintiff restates and realleges the allegations contained in paragraphs 1 – 116 herein.

209.   This is an action to recover fraudulent transfers pursuant to §§ § 726.105(1)(a) and 726.108, *Florida Statutes*.

210.   Within four years prior to the bringing of this action, Vista made payments to Hawkins which were intended to and represented the purchase of Hawkins' 45% interest solely to the benefit of Santana.

211.    The payments to Hawkins were a transfer of an interest in property of Vista, and the transfer of the interest should have accumulated as treasury ownership to Vista, but were instead transferred directly to Santana.

212.    Vista made, at the direction of Santana, these transfers to Hawkins with the actual intent to hinder, delay, or defraud Majors, Santana's wife, Hawkins' wife, and any other entity to which Vista was or became, on or after the date that such payments were made, indebted.

213.    Vista received less than reasonably equivalent value from Santana in exchange for the payments to Hawkins and the transfer of 45% ownership to Santana.

214.    Vista made the payments in furtherance of Vista and Santana's scheme to defraud Majors.

215.    Vista and Santana concealed the payments and the nature of the payments.

216.    Upon information and belief, Vista made payments to Hawkins using all or part of the Investment Funds.[19]

217.    Vista and Santana fraudulently booked certain of the payments as "deferred management fees" to defraud both Majors and, upon information and belief, the Internal Revenue Service.[20]

218.    Vista and Santana made the payments to Hawkins, an insider of Vista, and for the benefit of Santana, an insider of Vista.

---

[19] This allegation is based upon the timing of the two transactions and the fact that the financial statements later provided to Majors revealed that numerous, unexplained payments were made by Vista to Hawkins in the same year as the Investment Funds were received by Vista.

[20] The allegation regarding tax fraud is based upon the belief that the purchase of stock or ownership for the benefit of a remaining owner of the company is equivalent to a distribution to the remaining owner and not an expense or other deductible consulting fee.

219.    Pursuant to § 726.108, *Florida Statutes*, the transfer of Hawkins' 45% ownership to Santana from Vista is avoidable, and the value of that transfer at the time of the transfer— $5,040,000.00—is recoverable from Santana.

Wherefore, Plaintiff requests this Court to enter Judgment against Santana for damages equal to the value of Hawkins' 45% ownership, the total amount of the payments to Hawkins, or $5,040,000.00, whichever is greater, against Santana, and for such other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Majors demands trial by jury in this action of all issues so triable.

Roman V. Hammes, Esq.
Florida Bar No. 087250
Roman V. Hammes, P.L.
1920 N. Orange Avenue, Suite 100
Orlando, FL 32804
Telephone: (407) 650-0003
Email: roman@romanvhammes.com

Attorney for Timothy F. Majors

and

Michael A. Nardella, Esq.
Florida Bar No. 051265
Nardella & Nardella, PLLC
250 East Colonial Drive, Suite 102
Orlando, FL 32801
Telephone: (407) 966-2680
Email: mnardella@nardellalaw.com

Attorney for Timothy F. Majors